




AUSA Matthew F. Madden (312) 886-2050

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAGISTRATE JUDGE NOLAN

UNITED STATES OF AMERICA

v.

JOHN HEMPHILL

**CRIMINAL COMPLAINT**

CASE NUMBER: 09CR 840

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief:

On or about May 14, 2009, in the Northern District of Illinois, Eastern Division, and elsewhere, JOHN HEMPHILL defendant herein, devised and executed a scheme to defraud and to obtain money by means of material false and fraudulent pretenses, representations and promises, using the United States mail, in violation of Title 18, United States Code, Section 1341.

On or about August 13, 2009, in the Northern District of Illinois, Eastern Division, JOHN HEMPHILL, defendant herein, falsely assumed and pretended to be an officer, agent and employee acting under the authority of the United States, and acted as such, in violation of Title 18, United States Code, Section 912.

I further state that I am a Postal Inspector with the United States Postal Inspection Service, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
JOHN D. DONNELLY
Postal Inspector, United States Postal Inspection Service

Sworn to before me and subscribed in my presence,

October 15, 2009 at Chicago, Illinois
Date City and State

NAN R. NOLAN, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

UNITED STATES DISTRICT COURT )
) ss
NORTHERN DISTRICT OF ILLINOIS )

AFFIDAVIT

I, John D. Donnelly, being duly sworn, state as follows:

**INTRODUCTION**

1. I am employed as a Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since 1996. My primary duties include investigating criminal violations of laws involving the United States Mails including but not limited to, the crime of mail fraud, as defined at Title 18, United States Code, Section 1341 (Mail Fraud). In my capacity as a Postal Inspector, I also investigate bank fraud, wire fraud, money laundering and other financial crimes. I have received specialized training in the enforcement of federal laws and have been involved in various investigations involving postal crimes. I have initiated and participated in criminal investigations involving the execution of search warrants, the review of subpoenaed financial and real estate documents, physical surveillance, arrests, and convictions.

2. The information contained in this affidavit is based on my personal knowledge, my review of records, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. The information below is provided for the limited purpose of establishing probable cause to believe that John Hemphill (1) on or about May 14, 2009, devised and executed a scheme to defraud and to obtain money by means of material false and fraudulent pretenses, representations and

promises, using the United States mail, in violation of Title 18, United States Code, Section 1341, and (2) on or about August 13, 2009, falsely assumed and pretended to be an officer, agent and employee acting under the authority of the United States, and acted as such, in violation of Title 18, United States Code, Section 912.

## FACTS IN SUPPORT OF PROBABLE CAUSE

3. As further discussed below, my investigation to date has established evidence that, from approximately 2002 until present, John Hemphill has engaged in a scheme to defraud property owners and prospective purchasers of property by creating and recording fictitious deeds with county recorder of deeds ("CRD") offices in various counties in Illinois, posing as the property owner selling the property in question. Hemphill typically files a fictitious deed with the CRD that purports to convey title to a parcel of property from its lawful titleholder to one of Hemphill's businesses, and then files a second fictitious deed purporting to convey title to the same property from Hemphill's business entity (the new purported owner) to a third party. To further the scheme, Hemphill also falsely represents to prospective purchasers of properties that Hemphill and Hemphill's business entities have title to these properties in their capacity as a "federal receiver" or otherwise have lawful authority to convey the properties to third parties. By virtue of those false pretenses, Hemphill then purports to sell these properties to third parties in exchange for valuable consideration, usually cash payments from the third parties.

4. Also as part of the scheme, using multiple business names, Hemphill has falsely represented that Hemphill is an official and/or employee of the United States government, and that his business entities are agencies of the United States Government. The names of the business entities that Hemphill has used in this manner are the "United States Mortgage Release Corp" and the "United States Receivers Caretakers Assn." According to public records filed with the Illinois Secretary of State's office, Hemphill is the president and registered agent for the United States Mortgage Release Corp, and the president of the United States Receivers Caretakers Assn.

**A. Filing of False Deeds for Property at 8600 South Stoney Island**

5. On or about January 23, 2009, BP America, Inc. sold a gas station located at 8600 South Stony Island, Chicago, Cook County, Illinois (PIN 20-35-415-037) (hereinafter the "Stoney Island Property"), to PAV2, LLC (hereinafter "PAV2"), an affiliate of Atlas Oil Company. On or about January 29, 2009, a quitclaim deed was filed in the Cook County Recorder of Deeds office ("CCRD") with respect to the Stony Island Property, in which BP America, Inc., released and conveyed its title interest in the property to PAV2.

6. On or about May 6, 2009, a document prepared by "United States Mortgage Release Corporation" was filed in the CCRD office. The document, entitled "warranty deed," listed PAV2 as the grantor, and purported to convey title in 8606 South Stony Island, Chicago, Illinois (PIN 20-35-415-037),[1] to the "United States Recievers [sic] Caretakers

[1]The address listed on the "warranty deed" – 8606 S. Stony Island – was slightly different than the address of the Stoney Island Property. However, the PIN was the same.

Association." However, the "warranty deed" was not signed by the grantor and it was not notarized. Added to the bottom of the "warranty deed" is the following type-written line: "U.S. GOVERNMENT.................. www.u.s.receiverscartakersassocation.com [sic]."[2] The CRD office stamped the document with a document number and date, and also stamped the document "DONE AT CUSTOMER'S REQUEST." According to a representative of the CCRD, the CCRD office has stamped numerous documents filed by Hemphill or his associates as "DONE AT CUSTOMER'S REQUEST" because the CCRD office believes that the documents are facially invalid and/or fraudulent.[3]

7. According to a representative of PAV2, this "warranty deed" was filed without the authorization, permission, or knowledge of PAV2.

8. On or about May 5, 2009, another document prepared by "United States Mortgage Release Corporation" was filed in the CRD office. The document, also entitled "warranty deed," listed "United States Recievers [sic] Cartakers [sic] Associacin [sic]" as the grantor, and purported to convey title in 8606 South Stony Island, Chicago, Cook County, Illinois (PIN 25-35-415-037), to two individuals. However, the "warranty deed" was not

---

[2]This website does not exist. In my training and experience, the use of a website that does not exist can be an indicator of fraud.

[3]In addition, according to a representative of the CCRD, the "DONE AT CUSTOMER'S REQUEST" stamp was intended to be a "red flag" to title companies that the filings may be fraudulent.

signed by the grantor and it was not notarized.[4] The bottom of the "warranty deed" again contained the representation that the document was being provided by the "U.S. GOVERNMENT................. www.u.s.receiverscartakersassocation.com [sic]." The CRD office stamped the document with a document number and date, and also stamped the document "DONE AT CUSTOMER'S REQUEST."

9. According to a representative of PAV2, this second "warranty deed" was filed without the authorization, permission, or knowledge of PAV2.

10. On or about May 17, 2009, PAV2 received a letter sent via the United States Mail with the return address listed as "U.S. Receivers Caretakers Assoc., 10721 W. Capitol, Wauwatosa, WI 53222." According to the postage stamp on the envelope, the letter was mailed in Chicago on May 14, 2009. The letter listed "John Hemphill, 211 E. 79th St., Chicago, IL 60620" as the sender, and was sent on letterhead of "United States Receivers Association, Real Estate Agency, 211 E. 79th St., Chicago, IL 60620, (hereinafter the "USRCA Office") Telephone (312) 391-7292." The letter provided:

> "The United States Receivers Caretakers Association has claimed ownership of 8606 Stony Island. We have taken all legal steps to pursue this property. The previous owner no longer has ownership of this property it's up for sell [sic]. The mortgage has been fully satisfied and the previous owner to this property is no longer in debt. This property has also been conveyed from the previous owner to the United States Government, which has legally taken ownership over this property.

---

[4] Notably, the first two numbers in the PIN have been changed from "20" to "25" for this parcel. This appears to be an error.

Sincerely, John Hemphill
United States Receivers Caretakers Assoc.

If you have any questions concerning the status of the property, billing, etc. I can be reached at (312) 391-7292."

11. In or about late March 2009, an attorney ("Attorney A") representing Atlas Oil Company and its affiliate PAV2, called the telephone number listed at the bottom of the letter received from United States Receivers Caretakers Association. A male identifying himself as John Hemphill answered the telephone. Hemphill told Attorney A that Hemphill owned the Stony Island Property. Attorney A asked Hemphill to show him proof that Hemphill owned the Stoney Island Property. Hemphill said that he would fax Attorney A documents that proved that Hemphill owned the property. Atlas Oil Company has yet to receive any fax from Hemphill. Attorney A subsequently attempted to call Hemphill, but the telephone number was disconnected.

12. In or about August 2009, an Atlas Oil contractor was at the Stony Island Property and was approached by someone who identified himself as John Hemphill. The person who identified himself as Hemphill advised the contractor that he owned the property and told the contractor to leave. The person who identified himself as Hemphill provided the contractor with his name and a telephone number. The telephone number was different than the one Hemphill provided to PAV2 in the letter sent on or about May 14, 2009.

13. In or about August 2009, Attorney A called the telephone number for Hemphill received by the Atlas Oil contractor in August 2009. A male identifying himself as John

Hemphill answered the telephone. The individual who identified himself as Hemphill stated that he obtained this property through "federal receivership." Hemphill later stated that he obtained the property pursuant to a "drug forfeiture."

**B. Hemphill Purports to Sell Properties to Undercover Officer**

14. On or about August 13, 2009, an undercover law enforcement officer ("UCO") entered the USRCA Office, which was open to the public. Upon entering the USRCA Office, the UCO observed an unidentified woman working on a desktop computer at a desk in the office. The UCO also observed a man later identified as Hemphill sitting at the desk with the woman.

15. Prior to entering the office space, the UCO had viewed an Illinois state identification card photo of John Hemphill. The UCO recognized the man who was sitting at the desk in the office as the same individual depicted in the Illinois state identification card photo of John Hemphill. In addition, the male later identified himself as Hemphill and provided the UCO with a business card that listed his name as John Hemphill of the United States Receivers Caretakers Association.

16. Hemphill asked the UCO if the UCO was looking to buy a house. The UCO said that he was interested in buying a house. Hemphill explained to the UCO that the United States Receivers Caretakers Association ("USRCA") had properties available for purchase, and that Hemphill would provide the UCO with a list of those properties. Hemphill said that the price range for the properties was between $10,000 and $40,000. Hemphill also said that

the UCO only had to give him a down payment of $500 and Hemphill would give the UCO the keys and possession of the property at that time. According to Hemphill, the UCO would then be required to sign a contract which would give the UCO six months to pay the balance owed on the property. Hemphill said that Hemphill would prepare a list of properties for the UCO and gave the UCO his business card.

17. The business card that Hemphill gave to the UCO falsely represents that Hemphill is employed by and acting under the authority of the United States government. The top of the card lists the name of Hemphill's company in bold: "United States Receivers Caretakers Assoc." A copy of the Great Seal of the United States[5] – which is a bald eagle with an olive branch in one talon and thirteen arrows (representing the thirteen original colonies) in the other talon – is prominently featured in the middle of the card underneath five stars. To the right of the bald eagle, the card provides: "U.S. Government" and lists an address in Wauwatosa, Wisconsin, and the address of the USRCA Office.

18. While the UCO was talking to Hemphill at the USRCA Office on August 13, 2009, the UCO was able to observe in plain view the computer screen of the desktop computer and the desk where the unidentified woman was working. The UCO observed a document on the computer screen entitled "warranty deed," and the woman appeared to be

[5]The Great Seal of the United States is featured on a number of official documents issued by the United States Government and/or its departments and agencies, including United States passports and dollar bills.

editing that document on her computer. The UCO also observed two documents entitled "warranty deed" on the desk.

19. On or about August 18, 2009, at approximately 10:25 a.m., the UCO called Hemphill at the office number listed on Hemphill's business card. Hemphill answered the telephone. The UCO identified himself, and asked when he could pick up the list of properties from Hemphill. Hemphill asked the UCO to come to the USRCA Office that same day at 2:30 p.m. to pick up the list of properties.

20. That same day, the UCO entered the USRCA Office at approximately 2:30 p.m. to meet with Hemphill. Hemphill was not present when the UCO arrived, and an unidentified woman – who was the same woman that the UCO observed working on the computer on August 13, 2009 – told the UCO that he could wait for Hemphill. The woman later told the UCO that her name was Andrea. Hemphill arrived at the USRCA Office at approximately 3:00 p.m. and provided the UCO with a list of properties. The list contained approximately 46 addresses of properties identified as being in foreclosure on a printout from the website www.bargain.com,[6] and approximately eight additional addresses of properties handwritten on the printout.

21. When the UCO asked Hemphill whether Hemphill actually owned the properties on the list, Hemphill said that the UCO should look at the listed properties and tell Hemphill which one he wanted. Hemphill said that the UCO should drive by the properties

---

[6]This website–www.bargain.com–is a bargain-shopping website for both real estate and goods.

to see if the properties were vacant because Hemphill could give the UCO immediate access to the vacant properties. However, Hemphill said that Hemphill would sell the UCO a property even if someone was living there. According to Hemphill, anyone living in these properties was a "squatter." Hemphill also said that the actual value of those properties ranged from approximately $80,000 to $140,000, but that Hemphill would sell the properties to the UCO for a range of approximately $3,000 to $9,000. Hemphill told the UCO to call him when the UCO picked a property to buy, and then Hemphill would have a contract written up. Hemphill told the UCO that the UCO would be required to pay Hemphill $500 as a down payment, and then pay the balance over 90 days. Hemphill also said that Hemphill had a "receivership." According to Hemphill, this meant that the UCO would be able to buy the properties for the exact price set by Hemphill and the UCO would not have to bid against anyone else.

22. At approximately 8:19 a.m. on or about August 31, 2009, the UCO called Hemphill on the telephone and told him that the UCO had picked a property to purchase. Hemphill told the UCO to call the USRCA office and let them know.

23. Later that same day, the UCO called the USRCA office and advised Andrea that he wanted to purchase the property at 5436 South Paulina in Chicago, Illinois (hereinafter "the Paulina Property"), which was one of the properties on the list that Hemphill gave the UCO on August 18, 2009. According to publicly available records from the CCRD, Deutsche Bank Trust Co. Amer. is the titleholder of the Paulina Property.

24. At approximately 2:17 p.m. on September 2, 2009, the UCO called the USRCA office phone number and a woman who identified herself as Andrea answered the telephone. In addition, the UCO recognized Andrea's voice from his conversations with her at the USRCA Office. The UCO reminded Andrea that he was the person who wanted to purchase the Paulina Property. The UCO asked Andrea what he needed to do next now that the UCO had picked a property. Andrea told the UCO to bring in his money to the USRCA Office tomorrow, and that she would give him a receipt and get his paperwork together. The UCO agreed to bring his money to the USRCA office at approximately 11:00 a.m. the next day, which was September 3, 2009.

25. At approximately 2:54 p.m. on September 2, 2009, the UCO called the USRCA office number and Hemphill, who identified himself as John, answered the phone. The UCO told Hemphill that the UCO had talked to Andrea, and planned to come into the USRCA office tomorrow to drop off a cashier's check, but wanted to know to whom to make the cashier's check payable. Hemphill told the UCO to make the cashier's check out to "United States Receivers Caretakers Association." Hemphill said that the UCO would get the keys to the property the day after the UCO dropped off his payment. The UCO asked if Hemphill would also give the UCO proof of ownership so that the UCO could change the water bill and utility bills to his name. Hemphill said that Hemphill would provide the UCO all of the copies and information.

26. On or about Thursday, September 3, 2009, the UCO entered the USRCA Office at approximately 11:31 a.m. to meet with Hemphill. Both Hemphill and Andrea were present when the UCO entered the USRCA Office, and Hemphill greeted the UCO. The UCO advised Andrea that he wanted the Paulina Property, and the UCO gave Andrea a Chase cashier's check for $500 paid to the order of "United States Receivers Caretakers Assoc." Hemphill then approached the UCO and asked the UCO if he picked a house. The UCO said that he had. Andrea then produced a receipt for the UCO, and asked Hemphill to sign it. The UCO observed Hemphill sign the receipt, and then Andrea gave the receipt to the UCO. The receipt had the following name and address at the top: "United States Receiver Caretaker Assosiation [sic], 211 E. 79th Street, Chicago, IL, 60619, (773) 994-7083." In addition, the receipt had the following text:

"September 3, 2009

The UNITED STATES RECEIVER CARETAKERS ASSN Received: $500.00
From: [the UCO]

For the RENT and LEASE 5436 S. Paulina Ave. Chicago, IL 60609

[Signed by Hemphill] Balance Due: $5,500 [handwritten by Andrea]
Payable 6 months [handwritten by Andrea]

PAID [stamped]"

27. When the UCO asked Hemphill what the next step was, Hemphill told the UCO that the UCO could come back tomorrow to pick up the deed. Hemphill also asked if the property was empty. The UCO said that it was. Hemphill then said that he would have someone go to the property to change the locks and that Hemphill would give the UCO the

keys. Hemphill also told the UCO that he was an agent of the government. Hemphill explained that he was giving the UCO a "rent to own lease." Hemphill said that he would give the UCO an "addendum" and the keys to the property the next day, and that Hemphill would give the UCO the deed in six months. Before the UCO left, Andrea told the UCO that it would be better to come back on Tuesday (which would be September 8, 2009), and the UCO agreed to come back then.

28. At approximately 10:16 a.m. on September 8, 2009, the UCO called the USRCA office phone number and Andrea answered. Andrea told the UCO that Hemphill was not able to record anything yet and that the UCO should call back tomorrow. The UCO advised her that he now intended to pay the full balance of $5,500 as long as USRCA provided the UCO with proof of ownership. Andrea said that they would give the UCO the deed and that if the locks had not already been changed, the UCO would be responsible for changing them.

29. At approximately 12:10 p.m. on September 14, 2009, the UCO called the USRCA office number and Andrea answered. The UCO asked Andrea if he could come into the USRCA office to pay for the property and pick up his documents. Andrea said no because "he" [Hemphill] was going to record the "stuff" today that he didn't have the chance to record earlier. Andrea later said that the UCO's "stuff" was being notarized and, as a result, should be recorded later in the week. Andrea added that "he" [Hemphill] was on his way to Indiana right now to get the UCO's documents notarized.

30. At approximately 11:20 a.m. on September 18, 2009, the UCO called the USRCA office number and an unidentified male answered the telephone. The UCO asked to talk to Hemphill or Andrea, and the person who answered the phone said that they were not available. That individual then put a female, who later identified herself as Bonnie, on the telephone to take a message. The UCO provided Bonnie with his name and number, and told her that he was waiting to complete a real estate deal with Hemphill. Bonnie said that Hemphill was present at the office in a meeting, but that she would give Hemphill the message.

31. At approximately 5:06 p.m. on September 22, 2009, the UCO called the USRCA office telephone number and a male who later identified himself as Anthony Allen answered the telephone. The UCO asked if Hemphill was available. Allen said that Hemphill was not available but said that he (Allen) was Hemphill's brother. The UCO identified himself and advised Allen that the UCO was attempting to complete a real estate transaction with Hemphill. Allen said that he would give Hemphill the message.

32. On or about September 22, 2009, a "release deed," prepared by "U.S. Receivers Caretakers Association," was filed with the Cook County Recorder of Deeds ("CCRD"). The "release deed" purported to be a release by Deutsche Bank Trust Co. Amer. of the "mortgage claim" that it held on the Paulina Property. Added to the top of the document is the following type-written line: "United States of America."

33. At approximately 12:30 p.m. on October 13, 2009, the UCO entered the USRCA Office and talked to an unknown male who identified himself as Joseph. The UCO explained to Joseph that the UCO was looking for Hemphill to complete a real estate purchase. Joseph said that Hemphill was not present. Joseph asked the UCO to write down the UCO's name and telephone number on a piece of paper, which the UCO did. Joseph received a telephone call while talking to the UCO. Joseph told the UCO that the person on the phone was Anthony Allen, and Joseph handed the telephone to the UCO so that the UCO could talk to Allen. The UCO recognized the voice of the caller as the same "Anthony Allen" whom the UCO had previously spoken to on September 22, 2009. The UCO identified himself and said that the UCO wanted to complete the real estate deal. Allen apologized that the deal was not done, and asked the UCO if the UCO was already in the property. The UCO said no. Allen asked the UCO how much the balance was, and the UCO said that the balance was $5,500. Allen told the UCO that Allen would have everything the UCO needed–including the deed and the keys–by Friday (which would be October 16, 2009). The UCO thanked Allen and the UCO handed the telephone back to Joseph.

34. At approximately 5:13 p.m. on October 13, 2009, Hemphill called the UCO and asked the UCO if the UCO could come to the USRCA Office later that evening to complete the real estate deal. According to the caller ID from the UCO's telephone, Hemphill was calling the UCO from the USRCA Office. The UCO told Hemphill that the UCO could not meet that night, but that the UCO would be available to come to the USRCA Office on

October 14, 2009 at 2:00 p.m. Hemphill asked the UCO what the balance on the property was, and the UCO advised Hemphill that the balance on the property was $5,500. The UCO asked Hemphill if Hemphill would have the deed and keys for the property. Hemphill asked the UCO to remind Hemphill what the property address was. The UCO told Hemphill that the property address was 5436 South Paulina, Chicago, Illinois. Hemphill said that Hemphill would have the deed and keys ready for the UCO tomorrow (October 14, 2009).

35. At approximately 5:23 p.m. on October 13, 2009, the UCO called Hemphill at the office phone number. Hemphill answered the phone, and the UCO asked Hemphill if they could move their meeting until Thursday. Hemphill said that he would not be able to meet on Thursday. The UCO and Hemphill then agreed that they would meet at the USRCA Office at the previously scheduled time, which at 2:00 p.m. on Wednesday (October 14, 2009). The UCO asked Hemphill if Hemphill would give the keys and deed to the property to the UCO. Hemphill said, "That's correct."

36. At approximately 3:05 p.m. on or about October 14, 2009, the UCO entered the USRCA Office. Hemphill was sitting at the desk in the USRCA Office and the UCO approached him. Hemphill took a document entitled "special warranty deed" out of a folder, signed and dated it, and placed a "United States Receivers Caretakers Assoc." stamp on it. The UCO gave Hemphill two Chase cashier's checks for $2,750 each ($5,500 total) paid to the order of "United States Receivers Caretakers Assoc." Hemphill told the UCO that Hemphill would not be able to give the UCO the keys to the Paulina Property until the next

day (October 15, 2009). Hemphill then gave the document entitled "special warranty deed" to the UCO. The "special warranty deed" purported to convey title in the Paulina Property to from Deutsche Bk. Trust Co. to the UCO.

37. At approximately 3:15 p.m. on or about October 14, 2009, federal agents placed Hemphill under arrest. Hemphill was advised of his Miranda rights and waived those rights. He then told the agents that Hemphill was a federal officer and, as a result, the federal agents did not authority to arrest him.

**C. Additional Facts in Support of Probable Cause**

38. According to public records obtained from the CCRD and employees of the CCRD, Hemphill has filed dozens of "warranty deeds" or "special warranty deeds" in the CCRD office. Typically, one "warranty deed" is filed that purports to convey title in a property from a lawful titleholder to USRCA, and a second "warranty deed" is filed that purports to convey title to the same property from USRCA to a third-party. These "warranty deeds" and "special warranty deeds" are not signed by the grantor or notarized. The majority of the "warranty deeds" or "special warranty deeds" filed by USRCA were stamped as "DONE AT CUSTOMER'S REQUEST" by the CCRD.

39. When two employees of the CCRD office questioned Hemphill about the documents he was filing with the CCRD, Hemphill advised them that he was an agent of the U.S. government. Hemphill also produced a badge that indicated that he was an agent of the federal government.

## CONCLUSION

40. Based on the above information, I believe there is probable cause to believe that John Hemphill (1) on or about May 14, 2009, devised and executed a scheme to defraud and to obtain money by means of material false and fraudulent pretenses, representations and promises, using the United States mail, in violation of Title 18, United States Code, Section 1341, and (2) on or about August 13, 2009, falsely assumed and pretended to be an officer, agent and employee acting under the authority of the United States, and acted as such, in violation of Title 18, United States Code, Section 912.

FURTHER AFFIANT SAYETH NOT.

John D. Donnelly
Postal Inspector
U.S. Postal Inspection Service

Subscribed and sworn
before me this 15th day of October, 2009

Honorable Nan R. Nolan
United States Magistrate Judge